## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Rickie K. Smith, on behalf of himself and all others similarly situated, | Civil Action No.: |
| Plaintiff, | |
| vs. | |
| Rockwell Automation, Inc., the Rockwell Automation Employee Benefits Plan Committee, and John/Jane Does 1–20, | CLASS ACTION |
| Defendants. | |

## COMPLAINT

Plaintiff Rickie Smith, by and through his attorneys, on behalf of himself and all others similarly situated, based on personal knowledge with respect to his own circumstances and based upon information and belief pursuant to the investigation of his counsel as to all other allegations, alleges the following.

## INTRODUCTION

1.      This is a class action against Defendant Rockwell Automation, Inc. ("Rockwell"), the Rockwell Automation Employee Benefits Plan Committee (the "Committee"), and the individual members of the Committee (collectively with Rockwell and the Committee, the "Defendants") concerning the failure to pay benefits under the Rockwell Automation Pension Plan (the "Plan ") in amounts that are actuarially equivalent to a single life annuity, as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").  By not offering benefits that are actuarially equivalent to the single life annuity, Rockwell is causing retirees to lose part of their vested retirement benefits in violation of ERISA.

2. Rockwell sponsors the Plan for its employees. Plan participants accrue pension benefits in the form of a single life annuity ("SLA"), a payment stream that starts when they retire and ends when they die. Participants can also receive their pension benefits in other forms, including a 50% joint and survivor annuity ("50% JSA), which provides an annuity during the participant's life and then 50% of that amount to the participant's spouse after the participant's death, a 100% joint and survivor annuity ("100% JSA") and a 10-year certain-and-life annuity ("10YCLA"), which provide a participant (and a beneficiary) benefits for the life of the participant but at least for a minimum of 10 years, regardless of how long the participant lives. ERISA requires that these forms of benefit be "actuarially equivalent" to an SLA, meaning that the present value of the payment streams must be equal. *See* 29 U.S.C. § 1055(d)(1)(B) and (2)(A)(ii).

3. To calculate the amounts of the 50% JSA and the 10YCLA, Defendants apply actuarial assumptions to calculate the present value of the future payments. These assumptions are based on a set of mortality tables to predict how long the participant and beneficiary will live and interest rates to discount the expected payments. The mortality table and interest rate together are used to calculate a "conversion factor" which determines the amount of the benefit that would be equivalent to the SLA the participant accrued. The present value of any optional form must be equal to the SLA for the forms of payment to be "actuarially equivalent."

4. Mortality rates have improved over time with advances in medicine and better collective lifestyle habits. People who retired recently are expected to live longer than those who retired in previous generations. Older morality tables predict that people will die at a faster rate than current mortality tables. As a result, using an older mortality table to calculate a conversion factor decreases the present value a 50% JSA and 10YCLA and—interest rates being equal—the monthly payment that retirees who select these options receive.

2

5.     Defendants calculate the conversion factor (and thus the value of the 50% JSA and 10YCLA) using 1971 Group Annuity Mortality Table for Males (the "1971 GAM table") for the Plan's main part and the 1984 Unisex Pension ("UP 1984 table") for the part for the Cleveland-Ashtabula bargaining unit (the "Cleveland Sub-Plan"). The UP 1984 table was published in 1976, and was based on data from 1965-1970.[1] Although the UP 1984 table attempted to account for likely increases in life expectancy in each of the years between its date of publication and 1984 by extrapolating from increases in life expectancy for the period from 1957-1967, these projections ended up understating actual improvements in life expectancy from 1976-1984.[2]

6.     Using the 1971 GAM table and the UP 1984 table, which were developed over 40 years ago, depresses the present value of the benefits received in forms other than SLAs, resulting in monthly payments that are materially ***lower*** than they would be if the Defendants used reasonable, current actuarial assumptions. Defendants use outdated mortality assumptions to pay benefits even though Rockwell uses current, updated assumptions in its audited financial statements to calculate the benefits Rockwell expects to pay retirees.

7.     By using outdated mortality assumptions, Defendants caused Plaintiff, who worked for Rockwell for 42 years, to forfeit part of his retirement benefits in violation of ERISA. This improper reduction caused Plaintiff to receive less than he should each month, reducing the present value of his benefits

8.     Accordingly, Plaintiff seeks an Order from the Court reforming the Plan and Sub-Plans to conform to ERISA, payment of future benefits in accordance with the reformed Plan and

---

[1]     Paul Jackson & William Fellers, The UP-1984 – A "Unisex" Mortality Table For Non-Insured Pension Plans, at 37 Table 10 (Aug. 26, 1976), available at https://www.actuaries.org/IACA/Colloquia/Sydney1976/Vol_1/Jackson_Fellers.pdf (last viewed April 1, 2019).

[2]     *See* Society of Actuaries, San Francisco Annual Meeting, Session 39PD, at 2 (Record, Vol. 25, No. 3, Oct. 17-20, 1999).

Sub-Plans, as required under ERISA, payment of amounts improperly withheld, and such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

10.      This Court has personal jurisdiction over Defendants because they are headquartered, transact business, or reside in, or have significant contacts with this District, and because ERISA provides for nationwide service of process.

11.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

12.      Plaintiff Rickie K. Smith is a resident of Cedarburg, Wisconsin, and a Participant in the Plan. Mr. Smith worked for Rockwell for approximately 42 years until he retired in 2016. Mr. Smith is currently receiving a 10YCLA, with his son as the beneficiary.

4

**Defendants**

13.     Rockwell is a manufacturer of industrial automation and information technology with its headquarters in Milwaukee, Wisconsin. Rockwell sponsors the Plan and is the Plan Administrator.

14.     The Committee has fiduciary responsibility for the administration and operation of the Plan. The Committee is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or control respecting the management of the Plan and authority or control respecting the management or disposition of its assets.

15.     John/Jane Does 1 through 20, inclusive, are the individual members of the Committee responsible for controlling and managing the Plan. Their names and identities are not currently known.

## APPLICABLE ERISA REQUIREMENTS

### *Benefit Options*

16.     ERISA requires that benefits from a defined benefit plan be paid to married participants in the form of a qualified joint and survivor annuity (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment, making the QJSA the default benefit for employees who are married. *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

17.     A QJSA is an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse. *See* ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1). For example, if a plan participant receives $1,000 per month under a 50% joint and

survivor annuity, the spouse will receive $500 a month for the rest of the spouse's life after the participant's death.

18.     For an unmarried participant, the QJSA is an SLA.  *See* 26 C.F.R. § 1.401(a)-20, Q&A 25.  Pension plans may also offer participants alternative forms of survivor annuities, known as qualified optional survivor annuities ("QOSA").  *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2)); *see also* 26 U.S.C. § 417(g).  Some common forms of QOSAs are "certain and life" annuities, whereby a participant (and beneficiary) receives benefits for at least a specified minimum number of years, regardless of how long the participant lives. For example, a 10YCLA will provide a participant with a stream of payments for 10 years, whichever is longer.  If the participant dies within the ten-year period, the stream of payments to the participant's beneficiary continue for the remainder of the 10-year period. Under the Plan, the 10YCLA is the default benefit for unmarried employees. Plaintiff receives a 10YCLA.

19.     ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  *See* ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the participant's surviving spouse (i.e. a beneficiary) if the participant dies before reaching the plan's normal retirement age.  *See* ERISA § 205(e), 29 U.S.C. § 1055(e).

### *Benefit Options Must Be Actuarially Equivalent*

20.     "If an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . ***shall be the actuarial equivalent of such benefit*** . . . ." 29 U.S.C. § 1054(c)(3) (emphasis added).

21.     A QJSA must be actuarially equivalent to a single life annuity ("SLA"). *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).

6

22.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)), similarly provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."[3] Indeed, a QJSA "must be at least as valuable as any other optional form of benefit under the plan at the same time."  26 C.F.R. § 1.401(a)-20 Q&A 16.

23.     Both ERISA and the Tax Code require that a QOSA be actuarially equivalent to an SLA. *See* 29 U.S.C. § 1055(d)(2); 26 U.S.C. § 417(g).

24.     A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA and any QOSAs. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

25.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans like the Plan choose to offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the amount of the lump sum distribution be determined by calculating the present value of the benefit using the applicable mortality table (the "Treasury Mortality Table")[4] and applicable interest rate (the "Treasury Interest Rate")[5] (collectively, the "Treasury Assumptions"), set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and which are based on current market rates and mortality

---

[3]     26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Treasury regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity.  For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities."   26 C.F.R. § 1.401(a)-11(b)(1)(i)

[4]     26 C.F.R. § 1430(h)(2)-1.

[5]     26 C.F.R. § 1430(3)-1.

assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h). By requiring the use of current market rates and mortality assumptions to calculate the present value of participants' accrued benefits, the regulations ensure that lump sum distributions must be at least the actuarially equivalent of the QOSA, QJSA and QPSA.

26. ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable. ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if an employee's accrued benefit is in the form other than an SLA, the accrued benefit "shall be the actuarial equivalent" of an SLA.

27. The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a).

### Reasonable Factors Must be Used When Calculating Actuarial Equivalence

28. "Two modes of payment are actuarially equivalent when their present values are *equal* under a given set of assumptions." *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added).[6] Actuarial equivalence should be "cost-neutral," meaning that neither the Plan nor the participants should be better or worse off if the participant selects either the normal retirement benefit or an optional form of benefit. *See Osberg v. Foot Locker, Inc.*, 138 F.Supp.3d 517, 540 (S.D.N.Y. 2015).

29. Under ERISA, "present value" must "reflect anticipated events." Such adjustments shall conform to such regulations as the Secretary of the Treasury may prescribe." ERISA § 3(27),

---

[6] "Equivalent" means "equal." https://www.merriam-webster.com/dictionary/equivalent
"Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

29 U.S.C. § 1002(27). The Secretary has prescribed numerous regulations describing how present value should reasonably reflect anticipated events, including:

(a) The Treasury regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied **_reasonable actuarial factors_**, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b) A plan must determine optional benefits such as QJSAs, QOSAs, and QPSAs using "a single set of **_interest and mortality assumptions that are reasonable_** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c) With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using **_reasonable actuarial assumptions_** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

## SUBSTANTIVE ALLEGATIONS

## I. THE PLAN

30. Rockwell established the Plan on December 1, 1948. The Plan has several "subsidiary plans," which cover the benefit plans of Rockwell's various businesses that merged into the Plan. One of the subsidiary plans is the Cleveland Sub-Plan, which covers Rockwell employees in the IUE Local 737 bargaining unit in Euclid, Ohio.

31. The Plan (including the Cleveland Sub-Plan) is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

32. The Plan provides retirement benefits to participants based on their compensation and how many years they worked for Rockwell. Plan participants accrue benefits in the form of

an SLA. Participants in the Cleveland Sub-Plan also accrue benefits in the form of an SLA, but under a formula that pays them a certain amount each month (called a "monthly benefit multiplier") for each year they worked for Rockwell, less applicable offsets.

33. For unmarried Plan participants, the "normal form" of benefit is a 10YCLA. The default form for married participants is a 50% JSA. Participants can also choose an SLA or a lump sum payment.

34. For participants who receive a 10YCLA or 50% JSA, the SLA that they accrued is converted using the Plan's definition of "actuarial equivalence," the 1971 GAM and a 7% interest rate. If participants choose the lump sum option, their SLA is converted using the Treasury Assumptions.

35. The Cleveland Sub-Plan's "normal form" of benefit is an SLA for unmarried participants and a 50% JSA for married participants. Participants can also receive their benefits as a 10YCLA or a lump sum. For participants who receive a 10YCLA or 50% JSA, the SLA that they accrued is converted using the Plan's definition of "actuarial equivalence," the UP-84 and a 6% interest rate.

## II. The 10YCLA and the 50% JSA Benefit Forms Are Not Actuarially Equivalent to the SLA.

### A. Converting an SLA to Other Forms of Benefits.

36. As set forth above, ERISA requires that a QJSA, a QPSA and QOSAs be the "actuarial equivalent" of an SLA. *See* ERISA §§ 205(d)(1) and (2), 29 U.S.C. § 1055(d)(1) and (2). Under the Plan and the Cleveland Sub-Plan, the 50% JSA is the QJSA and the 10YCLA is a QOSA. Accordingly, they have to be actuarially equivalent to the SLAs that participants earned.

37. To convert an SLA into a QJSA, QOSA or QPSA, the present value of the **aggregate** (*i.e.,* total) future benefits that the participant (and, if applicable, the beneficiary) is

expected to receive under both the SLA and the QJSA, QPSA or QOSA must be determined. The present values are then compared to determine the conversion factor.[7] There are two main components of these present value calculations: an interest rate and a mortality table.

38. An interest rate is used to determine the present value of each future payment. This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns. The rate that is used is often called a "discount rate" because it discounts the value of a future payment.

39. The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27). The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, 29 U.S.C. §§ 1055(g)(3)(B)(iii), 1083(h)(2).

40. A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

41. More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The Society of Actuaries ("SOA"), an independent actuarial group, publishes the mortality tables that are the most widely-used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1983, 1976 (the "UP 1984"), 1994 (the "1994 GAR"), 2000 (the "RP-2000") and 2014 ("RP-2014") to account for changes to a population's mortality experience.

---

[7] The conversion factor is easily calculated by a computer model. Defendants simply input the assumptions and the model instantaneously calculates the conversion factor.

42.     Since at least the 1980s, the life expectancies in mortality tables have substantially improved as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.  According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

43.     Pursuant to Actuarial Standard of Practice No. 35, para. 3.5.3 of the Actuarial Standards Board,[8]  actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[9]

---

[8]     Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1–24–91 (1991)).

[9]     Available at: http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

Case 2:19-cv-00505-WED   Filed 04/08/19   Page 12 of 28   Document 1

44.     Accordingly, in the years between the publication of a new mortality table, mortality rates are often "projected" to future years to account for expected improvements in mortality.  For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality (the "2017 Treasury Mortality Table"). *See* IRS Notice 2016-50.[10] In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014 (the "2018 Treasury Mortality Table"). *See* IRS Notice 2017-60.[11]

45.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C. § 1002 (27). The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).

46.     Using the selected interest rate and mortality table, the present value of the SLA and the QJSA, QPSA or QOSA can be compared to determine whether the amount of the QJSA, QPSA or QOSA is actuarially equivalent to the SLA.

47.     Changes to mortality assumptions can have dramatic effects on the conversion factor and the value of a QJSA, QPSA or QOSA.  Using an antiquated mortality table generates lower present values of future payments, and the amount of the monthly benefit under a QJSA, QPSA or QOSA decreases.

48.     As discussed, plans must use reasonable interest rates and reasonable mortality tables to evaluate whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

---

[10]      Available at: https://www.irs.gov/pub/irs-drop/n-16-50.pdf
[11]      Available at: https://www.irs.gov/pub/irs-drop/n-17-60.pdf

**B.      The Plan and the Cleveland Sub-Plan Do Not Use Reasonable Actuarial Factors for Participants Who Receive a 10YCLA or a 50% JSA.**

49.      The Plan uses the 1971 GAM and a 7% interest rate to calculate the 10YCLA and 50% JSA forms of benefit.  The Cleveland Sub-Plan uses the UP-84 and a 6% interest rate to calculate the 10YCLA and a 50% JSA.

50.      Using the 1971 GAM table and the UP 1984 table to determine these benefits is unreasonable because both mortality tables are severely outdated and do not "reflect anticipated events" (i.e. the anticipated mortality rates of participants).

51.      The 1971 GAM table and the UP 1984 table are more than 40 years old, and they do not incorporate improvements in life expectancy that have occurred since they were published. According to the Centers for Disease Control and Prevention, in 1970, a 65-year-old had an average life expectancy of 15.2 years (16.8 years in 1984).[12]  In 2010, a 65-year-old had a 19.1-year life expectancy, a 26% increase (13% increase from 1984 to 2010). Accordingly, by 2010, the average employee would have expected to receive, and the average employer would have expected to pay, benefits for a substantially longer amount of time than in 1971 and 1984.

52.      Using these outdated mortality tables decreases the values of the 10YCLA and the 50% JSA relative to the SLA, thereby materially reducing the monthly benefits that participants and beneficiaries receive in comparison to the monthly benefits participants and beneficiaries would receive if the Plan and Cleveland Sub-Plan used updated, reasonable mortality assumptions. Participants who receive a 10YCLA or 50% JSA under the Plan and Cleveland Sub-Plan do not receive actuarially equivalent benefits.

---

[12]      *See* https://www.cdc.gov/nchs/data/hus/2011/022.pdf

14

53. Defendants knew or should have known that the 1971 GAM and UP 1984 tables were outdated and that it was unreasonable to use them because they resulted in lower monthly benefits for participants and beneficiaries receiving either a 10YCLA or a 50% JSA.

54. Rockwell uses up-to-date actuarial assumptions when calculating pension costs in its audited financial statements that it prepared with the assistance of an independent auditor throughout the Class Period. Under Generally Accepted Accounting Principles ("GAAP"), mortality assumptions "should represent the 'best estimate' for that assumption as of the current measurement date."[13] In its Annual Report for the year ending September 30, 2015 that Rockwell

---

[13] As noted in a "Financial Reporting Alert" by Deloitte:

> Many entities rely on their actuarial firms for advice or recommendations related to demographic assumptions, such as the mortality assumption. Frequently, actuaries recommend published tables that reflect broad-based studies of mortality. Under ASC 715-30 and ASC 715-60, each assumption should represent the "best estimate" for that assumption as of the current measurement date. The mortality tables used and adjustments made (e.g., for longevity improvements) should be appropriate for the employee base covered under the plan. Last year, the Retirement Plans Experience Committee of the Society of Actuaries (SOA) released a new set of mortality tables (RP-2014) and a new companion mortality improvement scale (MP-2014). Further, on October 8, 2015, the SOA released an updated mortality improvement scale, MP-2015, which shows a decline in the recently observed longevity improvements. Although entities are not required to use SOA mortality tables, the SOA is a leading provider of actuarial research, and its mortality tables and mortality improvement scales are widely used by plan sponsors as a starting point for developing mortality assumptions. Accordingly, it is advisable for entities, with the help of their actuaries, to (1) continue monitoring the availability of updates to mortality tables and experience studies and (2) consider whether these updates should be incorporated in the current-year mortality assumption.

Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 15-4, October 30, 2015 at 3. https://www2.deloitte.com/content/dam/Deloitte/us/Documents/audit/ASC/FRA/2015/us-aers-fra-financial-reporting-considerations-related-to-pension-and-other-postretirement-benefits-103015.pdf

filed with the SEC on Form 10-k, Rockwell represented that it measured its liabilities under the Plan using the RP-2014, with the MP-2014 improvement scale, not the 1971 GAM or UP-84 that it used to pay participants. Rockwell's 10-k filed with the SEC on November 15, 2015 states:[14]

> In October 2014, the U.S. Society of Actuaries released a new mortality table (RP-2014) and new mortality improvement scale (MP-2014). *We used these mortality tables to measure our U.S. pension obligation as of September 30, 2015.* This change in mortality assumptions resulted in a $222.1 million increase to our projected benefit obligation. (emphasis added).

55.     Rockwell has known since at least 2006 that its use of the 1971 GAM and the UP-84 were out-of-date. Rockwell's Annual Report for the period ending September 30, 2006 states:

> Additionally, in establishing our 2006 pension assumptions, we performed an actuarial experience study that changed other assumptions including retirement rate, employee turnover rate, and *mortality rate as a result of utilizing the RP2000 table projected forward 10 years.[15]*

56.     Rockwell used updated mortality tables in its financial statements throughout the Class Period. In its audited financial statements, Rockwell used reasonable actuarial assumptions to report a greater liability for the benefits that the Plan paid out to participants receiving a 50% JSA or a 10YCLA calculated using the unreasonable 1971 GAM table and the unreasonable UP-84 table. There is no reasonable justification for Defendants to use an old mortality table that presumes an early death and an early end to benefit payments in order to calculate an unfairly low annual benefit for participants, while at the same time using a reasonable mortality table to project a longer duration of these very same annual benefit payments for annual financial reporting.

---

[14]     *See* Rockwell's 10-k for year ending September 30, 2015 at 64, available at: http://d1lge852tjjqow.cloudfront.net/CIK-0001024478/bda22102-db37-4637-b863-f90e77122e08.pdf

[15]     *See* Rockwell's 10-k for year ending September 30, 2006 at 29; available at http://d1lge852tjjqow.cloudfront.net/CIK-0001024478/5a1cd6ad-b128-4d4d-80a8-036dd82a3eec.pdf

16

57.     Since these two analyses measure the length of the very same lives and the very same benefit streams, they should use the same mortality assumptions. "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather we stated, 'If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. Price WaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Edsen v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).   Although Defendants commonly used reasonable mortality tables in calculating actuarial present values, Defendants knowingly and wrongfully use the 1971 GAM and UP 1984 tables, mortality tables that are several decades out-of-date, to convert retirees' SLAs to a 50% JSA or a 10YCLA.

58.     Rockwell updates the mortality assumptions used in its financial statements filed with the SEC to predict for its shareholders the potential costs associated with the Plan based on the SOA's publications and the "experience studies" that it conducts the measure life expectancies. For Plan participants, however, Rockwell converts SLAs to other forms of benefits using old, outdated mortality assumptions, ignoring the SOA, in order to reduce the amount it pays retirees.

59.     Defendants misrepresented to participants that 50% JSA and 10YCLA were actuarially equivalent to SLAs to reduce the amount of benefits they paid participants.

60.     During the relevant period, Rockwell's use of the 1971 GAM table and the UP 1984 table to calculate 50% JSA and 10YCLA was unreasonable.

61.     Had the Plan used reasonable actuarial assumptions, such as the Treasury Assumptions, Plaintiff and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

62.     The chart below compares the amount that a Plan participant who is 65-years old (with a 65-year-old spouse) who accrued an SLA of $1,000/month would receive per month if she elected to receive her benefits in the form of a 10YCLA or a 50% JSA, using the 2018 Treasury Assumptions and the Plan's actuarial assumptions:

|          | 2018 Treasury Assumptions | 1971 GAM/7% | UP-84/6% |
|----------|---------------------------|-------------|----------|
| **SLA**  | $1,000                    | $1,000      | $1,000   |
| **10 YCLA** | $972.62                | $911.13     | $911.58  |
| **50% JSA** | $926.67                | $875.14     | $900.07  |

63.     While the amount of the differences between the 2018 Treasury Assumptions and the assumptions that Rockwell uses will vary depending on the ages of the participant and the beneficiary, ***all*** participants and beneficiaries who receive their benefits under the Plan and the Cleveland Sub-Plan in a form other than the SLA are not receiving an actuarially equivalent form of benefit because the present value is not equal to that of the SLA that they earned.

64.     Plaintiff retired at age 60 and 1 month and accrued an SLA of $1,616.25 per month. He is receiving a 10YCLA which pays $1,534.32 a month.  If the Treasury Assumptions were applied, Plaintiff's benefit would be $1,588.84, or $54.42 more per month than if the 1971 GAM/7% is used.  By using the 1971 GAM/7% instead of the applicable Treasury Assumptions, Defendants reduced the present value Plaintiff's benefits at the time of his retirement by $10,091.31.

65.     Discovery will likely show that Defendants use of unreasonable actuarial assumptions deprived retirees and their spouses of tens of millions of dollars.

66.     Because the Plan used grossly outdated, unreasonable mortality tables throughout the relevant time period, the benefits paid to participants and beneficiaries who receive QJSAs or QOSAs are *not* actuarially equivalent to what they would have received if they had selected an SLA, in violation of ERISA § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A).  Rather, the benefits payable under the QJSA and QOSA are much lower than they should be.

67.     Because Plaintiff's benefits were calculated using the 1971 GAM table, Plaintiff has been harmed because he is receiving less each month than he would if the Plan used current, reasonable actuarial assumptions. Plaintiff, along with other participants and beneficiaries, have been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the class (the "Class") defined as follows:

> All participants in and beneficiaries of the Plan and the Cleveland Sub-Plan who are receiving a 10YCLA or a 50% JSA calculated by using: (1) the 1971 GAM and a 7% interest rate; or (2) the UP-84 and a 6% interest rate.  Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plan.

69.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.

70.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

71.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to:

A.     Whether the Plan's method for calculating actuarially equivalent benefits provides benefits that are, in fact, actuarially equivalent to those that would be paid under an SLA;

B.     Whether the Plan's "conversion factors" are reasonable;

C.     Whether the Plan should be reformed to comply with ERISA; and

D.     Whether Plaintiff and Class members should receive additional benefits.

72.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

73.     This action may be properly certified under either subsection of Rule 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

74.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

75.     In the alternative, certification under Rule 23(b)(3) is warranted because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### FIRST CLAIM FOR RELIEF
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

76.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

77.     The Plan and the Cleveland Sub-Plan improperly reduce annuity benefits for participants and beneficiaries who receive either a 50% JSA or a 10YCLA below what they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires.

78.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

79.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating actuarial equivalence of 50% JSAs and 10YCLAs violate ERISA because they do not provide an actuarially equivalent benefit. By not providing an actuarially

equivalent benefit, Defendants have violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

80.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction, and payment of benefits previously paid for 50% JSAs and 10YCLAs under the Plan and the Cleveland Sub-Plan;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### For Reformation of the Plan and Recovery of Benefits Under the Reformed Plan
### (ERISA § 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))

81.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

82.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

83.     The Plan and the Cleveland Sub-Plan improperly reduce annuity benefits for participants and beneficiaries who receive a 50% JSA or a 10YCLA below what they would receive if those benefits were actuarially equivalent to an SLA as ERISA requires. By not providing an actuarially equivalent benefit, Defendants have violated ERISA's anti-forfeiture clause, ERISA § 203(a), 29 U.S.C. § 1053(a).

84.     Plaintiff is entitled to reformation of the Plan to require Defendants to provide actuarially equivalent benefits.

85.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

86.     Plaintiff is entitled to recover actuarially equivalent benefits, to enforce his rights to the payment of past and future actuarially equivalent benefits, and to clarify his rights to future actuarially equivalent benefits under the Plan following reformation.

### THIRD CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

87.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint.

88.     As one of the Plan's administrators, the Committee is a fiduciary of the Plan.

89.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

90.     The Committee and its members are fiduciaries for the Plan because they exercised discretionary authority and control over management of the Plan as well as authority and control over the disposition of Plan assets. In particular, they had authority or control over the amount and payment of benefits paid through 50% JSAs and 10YCLAs, which were paid from Plan assets.

91.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan insofar as the Plan is consistent with ERISA.

92.     The Plan is not consistent with ERISA because it uses the outdated 1971 GAM table and a 7% interest rate, and the UP-84 and a 6% interest rate for the Cleveland Sub-Plan, to calculate 50% JSAs and 10YCLAs. As a result, the Plan's calculation of benefits other than the lump sum and SLA produces results that are not actuarially equivalent resulting in participants and beneficiaries illegally forfeiting and losing vested benefits in violation of ERISA.

93.     In following the Plan and the Cleveland Sub-Plan, which did not conform with ERISA, the Committee and its members exercised their fiduciary duties and control over Plan assets in breach of their fiduciary duties.

94.     ERISA imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Committee to pay benefits that were not actuarially equivalent, in violation of ERISA, Rockwell breached its fiduciary duties to supervise and monitor the Committee.

95.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

96.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating actuarial equivalence of 50% JSAs and 10YCLAs violate ERISA because they do not provide an actuarially equivalent benefit.

97.     Plaintiff further seeks orders from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction and payment of benefits previously paid for 50% JSAs and 10YCLAs paid under the Plan and the Cleveland Sub-Plan;

(b)     an "accounting" of all prior benefits and payments;

(c)     a surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)    other relief the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    Certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that the Plan fails to properly calculate and pay 50% JSAs and 10YCLAs that are actuarially equivalent to single-life annuities, in violation of ERISA § 205(d)(1)(B), 29 U.S.C. § 1055(d)(1)(B) and ERISA § 205(d)(2)(A), 29 U.S.C. § 1055(d)(2)(A);

C.    Ordering Defendants to bring the Plan into compliance with ERISA, including, but not limited to, reforming the Plan to bring it into compliance with ERISA with respect to calculation of actuarially equivalent QJSAs, QOSAs, and QPSAs;

D.    Ordering Defendants to correct and recalculate benefits that have been paid;

E.    Ordering Defendants to provide an "accounting" of all prior payments of benefits under the Plan to determine the proper amounts that should have been paid;

F.    Ordering Defendants to pay all benefits improperly withheld, including under the theories of surcharge and disgorgement;

G.    Ordering Defendants to disgorge any profits earned on amounts improperly withheld;

H.    Imposition of a constructive trust;

I.    Imposition of an equitable lien;

J.    Reformation of the Plan;

K. Ordering Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

L. Ordering Defendants to pay future benefits in accordance with the terms of the Plan, as reformed;

M. Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

N. Awarding attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O. Any other relief the Court determines is just and proper.


Dated: April 8, 2019                         Respectfully submitted,

                                             **CRUEGER DICKINSON LLC**

                                             _/s/ Charles J. Crueger_
                                             Charles J. Crueger
                                             Erin K. Dickinson
                                             4532 North Oakland Avenue
                                             Whitefish Bay, WI 53211
                                             Tel: (414) 210-3868
                                             Fax: (414) 433-4544
                                             Email: cjc@cruegerdickinson.com
                                             Email: ekd@cruegerdickinson.com

                                             **IZARD, KINDALL & RAABE LLP**
                                             Robert A. Izard (to be admitted _pro hac vice_)
                                             Mark P. Kindall (to be admitted _pro hac vice_)
                                             Seth R. Klein (to be admitted _pro hac vice_)
                                             Douglas P. Needham
                                             Oren Faircloth
                                             29 South Main Street, Suite 305
                                             West Hartford, CT 06107
                                             Tel: (860) 493-6292
                                             Fax: (860) 493-6290
                                             Email: rizard@ikrlaw.com
                                             Email: mkindall@ikrlaw.com

Email: sklein@ikrlaw.com
Email: dneedham@ikrlaw.com
Email: ofaircloth@ikrlaw.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (to be admitted *pro hac vice*)
Mark G. Boyko
1054 31st Street, NW, Suite 230
Washington, DC 20007
(202) 463-2101
(202) 463-2103 fax
gporter@baileyglasser.com
mboyko@baileyglasser.com

*Counsel for Plaintiffs*